UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DENNIS LYNN CARTWRIGHT, JR,

      Defendant.

_____/

No. 1:20-cr-189
No. 1:21-cr-069

Hon. JANE M. BECKERING
United States District Judge

## GOVERNMENT'S SENTENCING MEMORANDUM

This is a combined sentencing concerning two cases – one involving a drug conspiracy, and the other concerning COVID-relief fraud. The government provides this sentencing memorandum to address three defense objections to the Presentence Investigation Report, and to emphasize key aggravating and mitigating factors in Defendant Dennis Cartwright's case.

### I. BACKGROUND

Following a joint investigation led by the DEA and IRS, Defendant Dennis Cartwright was indicted in two cases.

He took the first case to trial. (Case No. 1:21-cr-069, R.284: Final Presentence Investigation Report (PSR), PageID.1440, ¶ 11.) There, the government put on evidence that Defendant had joined an agreement to distribute drugs in West Michigan. The evidence included wire-intercepted telephone calls, cocaine seized from Defendant's car dealership (the Auto Den), and marijuana and guns that police found in Defendant's

basement. (*Id.* at PageID.1445-50.)

Cartwright testified in his defense, telling the jury that he had never purchased cocaine, or directed anyone else to do so, and that he had never engaged in drug dealing with codefendants Eiland Johnson and Mykael Booker:

Direct Examination

```
Q.   If I could just find my notes.  In closing, have you ever
purchased cocaine?
A.   No, I have not.
Q.   Have you ever directed anyone else to purchase cocaine?
A.   No, I have not.
```

(Case No. 1:20-cr-189, R.267: Trial Transcript – Vol. VI, PageID.1470.)

Cross Examination

```
A.   Mr. Johnson -- no.  Never bought drugs from Mr. Johnson.
Q.   Even though you told Mr. Johnson what he wanted to hear,
you didn't really mean it when you said, "Okay," after he
offered to sell you cocaine.  Correct?
A.   When -- I just said, "Okay."
Q.   Okay.  And so -- but you also testified earlier that when
Mr. Johnson called and offered you cocaine, you told him what
he wanted to hear to get him off the phone, correct?
A.   That is correct.
```

> Q. Okay. And even though Mr. Booker worked for you and you knew that he was a convicted drug dealer, he never purchased drugs on your behalf.
> A. That is correct.
> Q. And even though Mr. Booker has a video of cocaine on his phone, he never brought that to Auto Den, at least to your knowledge.
> A. That is correct.
> Q. Even though he called you after arriving back in town following making a video of a white powder substance that he described as a half bookie.
> A. That is correct.
> Q. And even though he said, "He had most of it in zips except for, like, 3 or 400 grams," you had no idea that he was bringing drugs to the Auto Den.
> A. **He did not bring drugs to the Auto Den.**

(*Id.* at PageID.1538.) Despite these denials, the jury convicted Cartwright of participation in the charged drug conspiracy, specifically finding that the amount of cocaine involved in the conspiracy was at least 500 grams. (Case No. 1:20-cr-189, R.244: Verdict Form, PageID.1238.)

Cartwright also specifically denied that he had any knowledge of the cocaine that was recovered at the Auto Den, his car dealership:

Direct Examination

Q. And one of the things that was found was cocaine. Was -- did you have any knowledge whatsoever of there being cocaine at Auto Den?

A. I did not.

Q. Would you have ever tolerated anyone having cocaine on your premises?

A. I would not. I worked too hard for that business.

Q. Do you have any idea how it got there?

A. I don't. I have speculation.

(*Id.* at PageID.1463.)

Cross Examination

Q. And it's your testimony, sir, that even though you own Auto Den, you had no idea about the cocaine inside it.

A. That is correct.

(*Id.* at PageID.1537.) Despite these denials, the jury convicted Cartwright of possessing this cocaine with the intent to distribute it. (Case No. 1:20-cr-189, R.244: Verdict Form, PageID.1239.)

Cartwright also testified concerning the firearms that police found in the basement office of his home. He told the jury that he did not know that the firearms were located in the desk where they were found, and he claimed that he had no right of access to that desk because it was his girlfriend's desk:

4

Q. And you say that this is your girlfriend's office, correct?

A. That is correct.

Q. And you have -- you had no right to go in there at all?

A. I said I had no right to go in her desk.

Q. You had no right to go in the desk. All right. So you go in the office but not in her desk?

Q. Okay. So you have no idea what's inside her desk.

A. I didn't know there was guns in the desk.

Q. But you did know there was guns in the office.

A. I didn't know exactly where the guns were, but I knew she had the guns.

Q. Okay. So --

A. I didn't know where they was at until I actually seen the pictures.

Q. Okay. But before that -- so earlier today you testified that --

A. I testified to the pictures that I saw.

Q. Earlier today you testified that you did know that there were guns in the house while you were living there, correct?

A. That is correct.

Q. Okay. And you also testified that you knew they were in the office, correct?

A. I knew they was in the office because I seen the pictures. I didn't know exactly where they were at, though.

Q. Okay. So you just knew -- on December 1, 2020, you knew there was guns somewhere in that office, but you didn't know that they were in the desk.

A. That's correct.

5

(*Id.* at PageID.1531-32.) Despite these denials, the jury found Cartwright guilty of possessing the firearms as a convicted felon. (Case No. 1:20-cr-189, R.244: Verdict Form, PageID.1239.)

Cartwright pleaded guilty in his second case, which involved a successful scheme to defraud the Small Business Administration of more than $1.4 million in COVID-relief payments distributed through the Paycheck Protection Program (PPP). (Case No. 1:21-cr-069, R.284: Final PSR, PageID.1461, ¶ 112.) Cartwright was not the architect of the fraud. Rather, he acted as an advisor to codefendants Jemar Mason and David Kurbanov, who actually caused the fraudulent PPP applications to be submitted. (*Id.* at PageID.1456, ¶ 92.) He counseled them to mark their personal spending as "payroll" checks, and he encouraged them to invest their loan proceeds in programs that would generate investment returns. (*Id.*) Cartwright also pocketed some of the fraud proceeds – he received $21,450 from Kurbanov and another $49,000 that was filtered through two LLCs. (*Id.* at PageID.1460, ¶ 108.) Ultimately, Cartwright pleaded guilty to receiving a $15,000 check that he knew represented the proceeds of wire fraud. (*Id.* at PageID.1443, ¶ 22 and PageID.1456, ¶90.)

The government has no objections to the presentence investigation report, but Cartwright has two. He objects that he did not perjure himself a trial and that, therefore, he should not incur the obstruction enhancement discussed in USSG §3C1.1. (Case No. 1:21-cr-069, R. 285: Def. Sent. Memo., PageID.1485.) He also objects that the Court should not assess the firearms enhancement codified in USSG § 2D1.1(b)(1). The government disagrees for the reasons discussed below.

**II.  DISCUSSION**

*A. Cartwright Obstructed Justice.*

U.S.S.G. § 3C1.1 establishes a two-point enhancement if a "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction[.]" To apply, the "obstructive conduct" must be "related to . . . the defendant's offense of conviction and any relevant conduct . . . ." *Id*. This guideline provision contains a non-exhaustive list of the types of conduct to which this enhancement applies, including in pertinent part, "committing, suborning, or attempting to suborn perjury." *Id*. at App. Note 4.  The Sixth Circuit instructs that when assessing points for obstruction of justice, district courts "should identify specifically which statements or actions by a defendant constitute an obstruction of justice." *United States v. Roberts*, 919 F.3d 980, 990 (6th Cir. 2019) (*citing United States v. Clark*, 982 F.2d 965, 970 (6th Cir. 1993)); *see also United States v. Dunnigan*, 507 U.S. 87, 95 (1993).

Here, the Court can make these specific, independent findings of the statements made by the defendant which constitute an obstruction of justice. Cartwright testified at trial, telling the jury that he was innocent of trafficking cocaine. The jury nevertheless convicted the defendant of participation in a drug trafficking conspiracy (Count 1). He told the jury he was ignorant of possessing the cocaine at his business, yet the jury convicted him of possessing this cocaine with the intent to distribute it (Count 4). He told the jury he lacked access to the desk where firearms were located and that he didn't know the guns were inside the desk, yet the jury convicted him of possessing these

7

firearms as a convicted felon (Count 5). Hence, the jury determined that the defendant testified falsely. This is the only way of squaring Cartwright's testimony with the jury's verdicts on these counts.

A defendant commits perjury, triggering a two-level enhancement under U.S.S.G. § 3C1.1, if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. Here, Cartwright's denials were self-serving, focused, and contradicted by other evidence in the record. This shows that his false statements were made willfully, not by accident.

Importantly, Cartwright had the absolute right to testify in his own defense at his trial. But that right does not permit him to commit perjury. *See United States v. Havens*, 446 U.S. 620, 626 (1980) (holding that a defendant's right to testify does not include a right to commit perjury.); *see also Dunnigan*, 507 U.S. at 96 (applying the obstruction of justice enhancement to defendant's sentence for her perjury at trial did not undermine her right to testify.) The defendant chose to make false statements to the jury. Consequently, he "attempted to obstruct or impede" justice, and the § 3C1.1 enhancement should be applied in calculating his guidelines range.

*B. The Firearms Enhancement Applies.*

Cartwright objects that, because the three firearms he possessed were "unloaded and found in a desk drawer," the PSR incorrectly applied the dangerous weapon enhancement of USSG § 2D1.1(b)(1). (ECF No. 346: PSR, PageID.1873.) The government disagrees.

8

The Sentencing Guidelines prescribe a two-level enhancement for a drug conspirator's base offense level if "a dangerous weapon (including a firearm) was possessed . . . ." USSG § 2D1.1(b)(1). Application note 11 to the Guideline advises that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable the weapon is connected with the offense." As the Sixth Circuit has explained, application of the enhancement involves a burden-shift:

> The government bears the burden of showing by a preponderance of the evidence that the defendant either "actually or constructively possessed the weapon." … Once the government meets its burden of showing that the defendant possessed a weapon, a presumption arises that 'the weapon was connected to the offense.' …. The burden then shifts to the defendant to "show that it was 'clearly improbable' that the weapon was connected with the crime."

*United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003) (quoting *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002) and USSG § 2D1.1, application note 11(a)).

The government has met its modest burden of proof on the issue of whether Cartwright possessed a firearm while he was participating in his drug conspiracy. Cartwright kept the firearms in a basement office across from his bedroom and down the hall from where he was storing pounds of marijuana. Moreover, one of the firearms *was* loaded, contrary to what Cartwright now claims. Note the live round of ammunition at the top of the magazine and the other rounds visible through the round indicator ports in these photos:





It isn't surprising that investigators found a weapon. Firearms are "tools of the drug-trafficking trade," so probative of drug dealing that they may be admitted in evidence at a narcotics trial "even if no firearms offense has been charged." *United States v. Cleveland*, 907 F.3d 423, 436 (6th Cir. 2018) (quoting *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008) and *United States v. Reyes*, 51 F. App'x 488, 493 (6th Cir. 2002)).

Cartwright nevertheless asserts that it was clearly improbable that the firearms were connected with his drug trafficking crimes. He makes two arguments in support of this claim.

10

First, he argues that the government cannot prove he either actually or constructively possessed these firearms. (Case No. 1:21-cr-069, R.285: Def. Sent. Memo., PageID.1490-91.) He's incorrect. Not only can the government prove this, it *already has*. That is the meaning of a jury verdict convicting him of possessing these firearms as a felon. Hence, Cartwright's possession of the firearms is, legally speaking, now beyond dispute.

Next, Cartwright turns to recent Sixth Circuit precedent discussing application of the firearms enhancement. He focuses on two cases in which the Sixth Circuit found the enhancement did not apply, *United States v. Hammock*, No.21-3793, 2022 WL 17330671 (6th Cir. November 29, 2022) and *United States v. Wilson*, No. 22-5068, 2022 WL17456351 (6th Cir. December 6, 2022).

Both cases are distinguishable. Neither case involved a defendant who, like Cartwright, and been found guilty of possessing the firearms that were the basis of the enhancement. Indeed, the proof of possession in those cases was much weaker than here. In *Wilson*, the firearms were recovered in a car that Wilson was riding in as a backseat passenger; one gun was up front, another was on a side other that where Wilson had been sitting, and the third wasn't visible without lifting up the seat. *Wilson*, 2022 WL 17456351 at * 1. As a result, the government's case for possession rested solely on Wilson's proximity to the guns, so the Sixth Circuit merely affirmed the longstanding rule that "something more than proximity is required to show constructive possession." *Id*. In *Hammock*, the firearm that prompted the enhancement was found in a trash can and a codefendant had pleaded guilty to possessing it. *Hammock*, 2022 WL 17330671 at at *2, n

11

1. Hammock denied knowing that the gun was in the trash can, and there was no proof that he did. Rather, the record was "devoid of any additional evidence that Hammock knew that a firearm was present or that he expected [his coconspirator] to be armed." *Id.* at *3. As in *Wilson*, the Sixth Circuit remanded Hammock's case for resentencing in order to police "the significant difference between the presence of a gun and possession of a gun . . . ." *Id.*

In contrast, there was much stronger circumstantial evidence of possession in Cartwright's case. The area where the guns were found was in his own home, across the hall form where he slept, in a desk that contained documents from his own business dealings. Beyond this, Cartwright now maintains that he knew the firearms were in the office. (Case No. 1:21-cr-069, R.285: Def. Sent. Memo., PageID.1487.) This puts him in a much different situation than the defendants in *Hammock* and *Wilson*.

Cartwright also directs this Court's attention to the jury's verdict of acquittal on the charge possessing the firearms in furtherance of drug trafficking. But a verdict of acquittal means only that the government failed to prove at least one element of a criminal offense beyond a reasonable doubt. With respect to the § 2D1.1 enhancement, both the standard and burden of proof are different. The government need only make a showing of firearm possession by a preponderance of the evidence, and after that, a defendant must prove a clear improbability that the firearm was involved in his drug crime.

Here, the evidence submitted at trial established beyond a reasonable doubt that Cartwright possessed the firearms. Hence, the burden now shifts to Cartwright to show

it was "clearly improbable" that the firearm was involved in his drug trafficking. He has not carried this burden, so the government asks this Court to overrule Defendant's objection to the application of USSG § 2D1.1.

*C. Cartwright Deserves a Lengthy Sentence.*

Title 18, U.S.C. § 3553(a) directs this Court to impose a sentence that reflects the "nature and circumstances of the offense" as well as the "history and characteristics of the defendant." The same statute instructs this Court to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" as well as the need to "protect the public from further crimes of the defendant . . . ." 18 U.S.C. § 3553(a)(2).

These factors weigh in favor of a lengthy sentence for Cartwright. Obstruction of justice is no small matter, and imposing a lenient sentence after he made false statements to the jury would promote disrespect for the law – the opposite of what the § 3553(a) factors envision. Moreover, Cartwright is a person who acts recklessly in order to make an easy dollar – he was willing to sell dangerous drugs and to benefit from fraud committed by his coconspirators. His disregard for public order and welfare show that there is a heightened need to protect the public from other crimes he may commit. Cartwright's actions also merit significant retribution – like his fraud coconspirators, he was willing to exploit a pandemic for his own financial gain.

**III.  CONCLUSION**

For the reasons stated above, the government respectfully asks this Court to overrule Cartwright's guidelines objections and impose a lengthy sentence.

13

                              Respectfully submitted,

                              MARK A. TOTTEN
                              United States Attorney

Dated: December 30, 2022        */s/ Austin J. Hakes*
                              AUSTIN J. HAKES
                              Assistant United States Attorneys
                              330 Ionia Ave NW Ste 501
                              Grand Rapids, MI 49503